IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROGER COUSTRY, Derivatively On Behalf of CIGNA CORPORATION,<br><br>               Plaintiff,<br><br>    vs.<br><br>H. EDWARD HANWAY, WILSON H. TAYLOR, MICHAEL W. BELL, CHARLES R. SHOEMATE, LOUIS W. SULLIVAN, PETER N. LARSON, JOSEPH NEUBAUER, HAROLD A. WAGNER, CAROL COX WAIT, MARILYN WARE, JANE E. HENNEY, FRED HASSAN, ALFRED C. DECRANE, JR. and ROBERT P. BAUMAN,<br><br>               Defendants,<br><br>   - and -<br><br>CIGNA CORPORATION, a Delaware corporation,<br><br>           Nominal Defendant. | ) Case No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

<u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of CIGNA Corporation ("CIGNA" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that occurred between October 1999 and the present (the "Relevant Period") and that have caused substantial losses to CIGNA and other damages, such as to its reputation and goodwill.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000.  This action is not a collusive one to confer jurisdiction on this Court it would not otherwise have.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

3.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with Pennsylvania so as to render the exercise of jurisdiction by the Pennsylvania courts permissible under traditional notions of fair play and substantial justice.

4.      Venue is proper in this Court pursuant to 28 U.S.C. §1367(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to CIGNA occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities  that had an effect in this District.

- 1 -

## SUMMARY OF THE ACTION

5.      CIGNA is an investor-owned employee benefits organization in the United States. Through its subsidiaries, the Company is a provider of employee benefits offered through the workplace, including health care products and services, group life, accident and disability insurance, retirement products and services and investment management.

6.      On October 14, 2004, *AFX International Focus* issued an article entitled "Spitzer attacks insurance industry." The article provided in relevant part:

> In his latest move in a high profile campaign against corporate wrongdoing, Eliot Spitzer charged several of the nation's largest insurance companies and the largest broker with bid rigging and pay-offs that the New York Attorney General says violate fraud and competition laws.
>
> Spitzer unveiled a law suit Thursday against the world's largest insurance broker Marsh & McLennan for a common industry practice known as "contingent commissions."
>
> Contingent commissions are paid by insurance companies to reward brokers for sending business their way. Critics claim the payments encourage brokers to sell policies from those insurance companies offering the highest commissions, rather than the ones most suited to their customers.
>
> Two executives from American International Group have pleaded guilty to charges related to the payments, Spitzer said during a televised press conference.
>
> "The prevailing thought within the insurance community was that this investigation would result in minor disclosure changes or a slap on the wrist," said Adam Klauber, an analyst at Cochran, Caronia & Co. "The fact that there are criminal charges suggests that Spitzer thinks parts of this business are really wrong and need changing."

7.      On October 19, 2004, *Reuters* issued an article entitled, "UPDATE 2-HMO shares plunge on worries over Spitzer probe." The article provided in relevant part:

> Cigna Corp. on Tuesday said it received a new subpoena from the New York Attorney General in a broadening probe into conflicts between insurers and brokers, sending shares of the entire HMO sector down sharply.
>
> Cigna, one of the biggest U.S. health insurers, said New York Attorney General Eliot Spitzer requested more information about its dealings with brokers, following the company's disclosure of an inquiry in June.

*   *   *

- 2 -

News of the requests came a week after Spitzer said he was suing the world's largest insurance broker, Marsh & Mclennan, on charges of bid rigging at the cost of its clients, in an inquiry that implicated several other companies.

8.    Upon the revelation of these illegal acts, the Company's shares fell to $59.73 from $66.58, a drop of 11%.

9.    During the Relevant Period defendants disseminated materially false and misleading statements concerning the Company's results and operations.  The true facts, which were known by each of the defendants but concealed from the public during the Relevant Period, were as follows:

(a)    That illegal and concealed "contingent commissions" pursuant to illegal "contingent commission agreements" were being paid;

(b)    That by concealing these "contingent commissions" and such "contingent commission agreements," the defendants violated applicable principles of fiduciary law, subjecting the Company to enormous fines and penalties totaling potentially tens - if not hundreds - of millions of dollars; and

(c)    That as a result of (a)-(b) above, the Company's prior reported revenue and income was grossly overstated.

## THE PARTIES

10.    Plaintiff Roger Coustry is, and was at times relevant hereto, an owner and holder of CIGNA common stock.  Plaintiff Coustry is a citizen of Colorado.

11.    Nominal defendant CIGNA is a corporation organized and existing under the laws of the state of Delaware with its headquarters located at One Liberty Place, 1650 Market Street, Philadelphia, Pennsylvania.  CIGNA is an investor-owned employee benefits organization in the United States. Through its subsidiaries, the Company is a provider of employee benefits offered through the workplace, including health care products and services, group life, accident and disability insurance, retirement products and services and investment management.

12.    Defendant H. Edward Hanway ("Hanway") is, and at all times relevant hereto was, President and a director of CIGNA.  Hanway is Chief Executive Officer ("CEO") of CIGNA and has been since January 2000.  Hanway is Chairman of the Board of Directors (the "Board") of CIGNA

- 3 -

and has been since December 2000.  Hanway was also Chief Operating Officer of CIGNA until January 2000.  Because of Hanway's positions, he knew the adverse non-public information about the business of CIGNA, as well as its illegal contingent commissions, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Hanway participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings.  For FY:99, FY:00, FY:01, FY:02 and FY:03, CIGNA paid defendant Hanway $6,256,800, $9,223,700, $10,482,900, $9,802,000 and $8,839,600, respectively, in salary, bonus, restricted stock awards, LTIP payouts and other compensation, and granted him 228,612, 284,526, 262,026, 328,526 and 250,000 options to purchase CIGNA stock, respectively.  Defendant Hanway is a citizen of Pennsylvania.

13.     Defendant Michael W. Bell ("Bell") is, and at times relevant hereto was, Executive Vice President and Chief Financial Officer of CIGNA since December 2002.  Bell was President of CIGNA's subsidary, CIGNA Group Insurance until December 2002.  Because of Bell's positions, he knew the adverse non-public information about the business of CIGNA, as well as its illegal contingent commissions, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the Relevant Period, Bell participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  For FY:01, FY:02 and FY:03, CIGNA paid defendant Bell $1,244,300, $1,582,600 and $2,782,700, respectively, in salary, bonus and other compensation, and granted him 31,486, 26,618, 37,800 options to purchase CIGNA stock, respectively.  Defendant Bell is a citizen of Pennsylvania.

- 4 -

14.     Defendant Wilson H. Taylor ("Taylor") was, at times relevant hereto, Chairman of the Board and a director of CIGNA until December 2000.  Taylor was CEO of CIGNA until January 2000.  Because of Taylor's positions, he knew the adverse non-public information about the business of CIGNA, as well as its illegal contingent commissions, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Taylor participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  For FY:99 and FY:00, CIGNA paid defendant Taylor $10,455,587 and $5,009,800, respectively, in salary, bonus, restricted stock awards and LTIP payouts and other compensation, and granted him 600,539 and 567,976 options to purchase CIGNA stock, respectively.  Defendant Taylor is a citizen of Pennsylvania.

15.     Defendant Charles R. Shoemate ("Shoemate") is, and at all times relevant hereto was, a director of CIGNA.  Because of Shoemate's position, he knew the adverse non-public information about the business of CIGNA, as well as its illegal contingent commissions, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Shoemate participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Shoemate is a citizen of New Jersey.

16.     Defendant Louis W. Sullivan ("Sullivan") is, and at all times relevant hereto was, a director of CIGNA.  Because of Sullivan's position, he knew the adverse non-public information about the business of CIGNA, as well as its illegal contingent commissions, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and

- 5 -

committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Sullivan participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Sullivan is a citizen of Georgia.

17.    Defendant Peter N. Larson ("Larson") is, and at all times relevant hereto was, a director of CIGNA. Because of Larson's position, he knew the adverse non-public information about the business of CIGNA, as well as its illegal contingent commissions, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Larson participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Larson is a citizen of New Jersey.

18.    Defendant Joseph Neubauer ("Neubauer") is, and at all times relevant hereto was, a director of CIGNA.  Because of Neubauer's position, he knew the adverse non-public information about the business of CIGNA, as well as its illegal contingent commissions, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Neubauer participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Neubauer is a citizen of Pennsylvania.

19.    Defendant Harold A. Wagner ("Wagner")  is, and at all times relevant hereto was, a director of CIGNA.  Because of Wagner's position, he knew the adverse non-public information about the business of CIGNA, as well as its illegal contingent commissions, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and

committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Wagner participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Wagner is a citizen of Pennsylvania.

20. Defendant Carol Cox Wait ("Wait") is, and at all times relevant hereto was, a director of CIGNA. Because of Wait's position, she knew the adverse non-public information about the business of CIGNA, as well as its illegal contingent commissions, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. During the Relevant Period, Wait participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Wait is a citizen of California.

21. Defendant Marilyn Ware ("Ware") is, and at all times relevant hereto was, a director of CIGNA. Because of Ware's position, she knew the adverse non-public information about the business of CIGNA, as well as its illegal contingent commissions, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. During the Relevant Period, Ware participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Ware is a citizen of Pennsylvania.

22. Defendant Jane E. Henney ("Henney") is, and at times relevant hereto was, a director of CIGNA since April 2004. Because of Henney's position, she knew the adverse non-public information about the business of CIGNA, as well as its illegal contingent commissions, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board

meetings and committees thereof and via reports and other information provided to her in connection therewith.   During the Relevant Period, Henney participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Henney is a citizen of Ohio.

23.     Defendant Fred Hassan ("Hassan") was, at relevant times hereto, a director of CIGNA from October 2001 until approximately April 2003.  Because of Hassan's position, he knew the adverse non-public information about the business of CIGNA, as well as its illegal contingent commissions, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Hassan participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Hassan is a citizen of New Jersey.

24.     Defendant Alfred C. DeCrane, Jr. ("DeCrane") was, at times relevant hereto, a director of CIGNA until April 2002.  Because of DeCrane's position, he knew the adverse non-public information about the business of CIGNA, as well as its illegal contingent commissions, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, DeCrane participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant DeCrane is a citizen of New York.

25.     Defendant Robert P. Bauman ("Bauman") was, at times relevant hereto, a director of CIGNA until approximately April 2001.  Because of Bauman's position, he knew the adverse non-public information about the business of CIGNA, as well as its illegal contingent commissions, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance

at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Bauman participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Bauman is a citizen of Florida.

26.     The defendants identified in ¶¶12, 14-25 are referred to herein as the "Director Defendants."   The defendants identified in ¶¶12, 13 are referred to herein as the "Officer Defendants." Collectively, the Director Defendants and the Officer Defendants are referred to herein as the "Individual Defendants."

### DUTIES OF THE INDIVIDUAL DEFENDANTS

27.     By reason of their positions as officers, directors and/or fiduciaries of CIGNA and because of their ability to control the business and corporate affairs of CIGNA, the Individual Defendants owed CIGNA and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage CIGNA in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of CIGNA and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

28.     Each director and officer of the Company owes to CIGNA and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

29.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of CIGNA, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions

with CIGNA, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of CIGNA.

30.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of CIGNA, and was at all times acting within the course and scope of such agency.

31.    To discharge their duties, the officers and directors of CIGNA were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of CIGNA were required to, among other things:

(a)    refrain from acting upon material inside corporate information to benefit themselves;

(b)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)    remain informed as to how CIGNA conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)    ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

32.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of CIGNA, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of CIGNA's Board during the Relevant Period.

33.    The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.  In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws.  As a result, CIGNA has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)    Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(b)    Costs incurred in investigating and defending CIGNA and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

34.    Moreover, these actions have irreparably damaged CIGNA's corporate image and goodwill.  For at least the foreseeable future, CIGNA will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior

and have misled the investing public, such that CIGNA's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

35.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

36.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at CIGNA and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and  (iii) deceive the investing public, including shareholders of CIGNA, regarding the Individual Defendants' management of CIGNA's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

37.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least October 1999 and continuing thereafter.  During this time the Individual Defendants caused the Company to conceal the true fact that CIGNA was misrepresenting its financial results.  In addition, defendants also made other specific, false statements about CIGNA's financial performance and future business prospects, as alleged herein.

38.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of

corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of CIGNA common stock so they could protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

39.    The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

40.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her  overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

41.    CIGNA is an investor-owned employee benefits organization in the United States. Through its subsidiaries, the Company is a provider of employee benefits offered through the workplace, including health care products and services, group life, accident and disability insurance, retirement products and services and investment management.

42.    There are basically three types of entities in the insurance market.  First, there are clients: companies and individuals seeking to purchase insurance for their businesses, employees or themselves.  Second, there are brokers and independent agents (collectively "brokers"), hired by clients to advise them as to needed coverage and to find insurance companies offering that coverage. Brokers represent the client, obtain price quotes, present the quotes to the client, and make recommendations to the client that include factors other than price, such as differences in coverage, an insurance company's financial security, or an insurance company's reputation for service or claims

payment.  Third, there are insurance companies.  They submit quotes to the brokers and, if selected by the client, enter into a contract to provide insurance for that client's risk.

43.     In this structure, the client makes two types of payments: (i) it pays its broker an advisory fee or a commission for locating the best insurer; and (ii) it pays the chosen insurance company premiums for the coverage itself.  When the client pays a commission this is usually accomplished in one check to the broker, with the broker deducting the commission and forwarding the premium to the insurance company.  Sometimes clients - particularly large commercial clients - break out the broker's fee and pay it directly to the broker.

44.     In addition to the first commission payment described above, brokers sometimes receive another kind of payment, as well, but not one from the clients.  These are called contingent commissions and come from insurance companies pursuant to arrangements generally known as contingent commission agreements.  The precise terms of these agreements vary, but they commonly require the insurance company to pay the broker based on one or more of the following: (i) how much business the broker's clients place with the insurance company; (ii) how many of the broker's clients renew policies with the insurance company; and (iii) the profitability of the business placed by the broker.

45.     One such broker to which the Individual Defendants caused CIGNA to pay contingent commissions was Universal Life Resources ("ULR").  The Individual Defendants caused the Company to enter into agreements with ULR that permitted the collection of undisclosed fees and kickbacks from the Company.  In exchange ULR agreed to steer its clients to CIGNA.  These agreements in turn allowed the collection of higher premiums than would be paid in a truly competitive market.  The ULR contingent compensation agreements were referred to as Special Compensation Agreements, Direct Vendor Marketing Agreements, or Override Agreements ("Agreements") between ULR and the Company.

46.     In addition, the Agreements provide that CIGNA pay compensation to ULR in the form of "Communication Fees," which are unwittingly charged to the insurance customers' employees.  In connection with the insurance products that the Company placed with ULR's

customers, which are provided as part of an employee-benefit plan available to the customers' employees, the Company also offers those employees the option to purchase optional insurance coverage, *e.g.,* optional group life, dependent group life, and/or supplemental long-term disability. The Communication Fees are then imposed on employees who choose an optional insurance policy. The costs of the Communication Fees are recouped by the Company by adding the cost to the premiums charged on these optional insurance policies. Moreover, the Individual Defendants caused CIGNA to conceal this arrangement from the Company's customers and those customers' employees.

47. In February 2003, ULR was employed by Brinker International, Inc. ("Brinker") to place Brinker's Group Life and Optional Life plans. In soliciting a proposal for CIGNA, ULR advised that:

> [T]he communications fees ... **should not be communicated to the client** without ULR's prior consent. The ***cost for this project can be factored into the Optional Life plan overhead*** or in the carrier's general overhead, but should not impact any other client plans, *i.e.,* Basic Life.

The Individual Defendants honored ULR's wishes and did not disclose the communication fees.

### IMPROPER STATEMENTS

48. On November 1, 1999, the Individual Defendants caused the Company to issue a press release entitled "CIGNA Reports Third Quarter 1999 Results." The press release provided in part:

> CIGNA Corporation today reported third quarter operating income from continuing operations of $286 million, or $1.47 per share, compared with operating income from continuing operations of $237 million ($1.12 per share) for the third quarter of 1998.
>
> Third quarter 1999 operating income excludes the following non-recurring items:
>
> -- an after-tax gain of $1.2 billion for the sale of the property and casualty (P&C) business to ACE Limited (reported in discontinued operations);
> -- a $400 million after-tax charge attributable to certain Brazilian investments; and
> -- $10 million of after-tax restructuring charges for cost reduction initiatives subsequent to the sale of P&C.
>
> For the nine months of 1999, operating income from continuing operations was $766 million ($3.76 per share), excluding the non-recurring items noted above and an after-tax gain of $43 million from the second quarter sale of a partial interest in CIGNA's Japanese life insurance business. This compares with $671 million

($3.12 per share) for the same period a year ago, excluding an after-tax gain of $202 million from the sale of CIGNA's individual life insurance and annuity business that was reported in the first quarter of 1998.

49.     On February 8, 2000, the Individual Defendants caused the Company to issue a press release entitled "CIGNA Reports Fourth Quarter and Full Year 1999 Results."  The press release provided in part:

> CIGNA Corporation today reported fourth quarter operating income from continuing operations of $296 million, or $1.66 per share.  This compares with operating income from continuing operations of $226 million, or $1.09 per share, for the fourth quarter of 1998, excluding the non-recurring item noted below.
>
> Excluding certain non-recurring items, full year 1999 operating income from continuing operations was $1.1 billion, or $5.38 per share, compared with $897 million, or $4.20 per share, for the same period a year ago.
>
> Full year 1999 operating income from continuing operations excludes the following non-recurring items:
>
> --      a third quarter after-tax gain of $1.2 billion from the sale of the property and casualty (P&C) business to ACE Limited (reported in Discontinued Operations);
> --      a third quarter after-tax charge of $10 million for cost reduction initiatives subsequent to the sale of P&C ($3 million reported in the International Life, Health and Employee Benefits segment and $7 million reported in the Corporate segment);
> --      a third quarter after-tax charge of $400 million attributable to certain Brazilian investments (reported in the International segment); and a second quarter after-tax gain of $43 million from the sale of a partial interest in CIGNA's Japanese life insurance business (reported in the International segment).
>
> Full year 1998 operating income from continuing operations excludes the following non-recurring items:
>
> --      a first quarter after-tax gain of $202 million from the sale of CIGNA's individual life insurance and annuity business (reported in the Other Operations segment); and
> --      a fourth quarter after-tax charge of $19 million for restructuring activities.  ($1 million reported in the International segment and $18 million reported in Discontinued Operations).
>
> "Operating results for our employee benefits businesses were strong again in 1999.  The sale of our property and casualty business to ACE Limited further positioned the company to focus on our employee benefits strategy," said Ed Hanway, CIGNA's CEO.

50.     On May 1, 2000, the Individual Defendants caused the Company to issue a press release entitled "CIGNA Reports First Quarter Results."  The press release provided in part:

CIGNA Corporation today reported first quarter 2000 operating income from continuing operations of $265 million, or $1.57 per share. This compares with operating income from continuing operations of $229 million, or $1.10 per share for the first quarter of 1999.

"We continued to see good growth in revenues and profits, particularly for our health businesses," said H. Edward Hanway, CIGNA's chief executive officer.

\* \* \*

Consolidated net income for the first quarter of 2000 was $271 million, or $1.60 per share. Consolidated net income for the same period last year was $188 million, or $0.91 per share, which included a $91 million after-tax charge for the cumulative effect of adopting a new accounting standard for guaranty fund and other insurance-related assessments, primarily related to the P&C business sold on July 2, 1999.

51.     On August 1, 2000, the Individual Defendants caused the Company to issue a press release entitled "CIGNA Reports Second Quarter Results." The press release provided in part:

CIGNA Corporation today reported second quarter 2000 operating income from continuing operations of $279 million, or $1.71 per share, excluding the after-tax charges of $127 million noted below. On this basis, earnings per share for the second quarter of 2000 increased 40% over earnings per share of $1.22 for the second quarter of 1999, excluding an after-tax gain of $43 million associated with the sale of a partial interest in a business.

During the second quarter of 2000, CIGNA sold a portion of its reinsurance business for approximately $170 million and placed its retained reinsurance business in run-off. The sale resulted in an after-tax gain of approximately $85 million that will be recognized over the next 10 to 15 years.

Operating income for the second quarter, as described above, excludes non-recurring after-tax charges of $127 million associated with the run-off reinsurance business principally for reserve strengthening for certain lines of business.

For the first half of 2000, operating income from continuing operations was $544 million ($3.27 per share), excluding the $127 million in non-recurring charges noted above, compared with $480 million ($2.33 per share) in the first half of 1999, excluding the $43 million gain noted above.

"Our health care operation continued to experience good profitability and good growth in business volume as measured by the addition of nearly one million medical members over the last 12 months," said H. Edward Hanway, CIGNA's chief executive officer. "Additionally, the recent sale of a portion of our reinsurance business has further sharpened the focus and commitment we have on our employee benefits strategy."

52.     On November 2, 2000, the Individual Defendants caused the Company to issue a press release entitled "CIGNA Reports Third Quarter Results ." The press release provided in part:

- 17 -

CIGNA Corporation today reported third quarter 2000 operating income from continuing operations of $281 million, or $1.76 per share, a 20% increase over operating income from continuing operations of $1.47 per share for the third quarter of 1999 (which excludes certain nonrecurring charges).

For the nine months of 2000, operating income from continuing operations was $825 million ($5.03 per share), excluding certain charges associated with the run-off reinsurance business recorded in the second quarter. This compares with operating income from continuing operations of $766 million ($3.76 per share) for the nine months of 1999, which excludes the nonrecurring charges referred to above and a $43 million after-tax gain on the sale of a partial interest in a business.

"We continue to achieve good earnings momentum and strong margins in our health care business for both our core products and specialty offerings," said H. Edward Hanway, CIGNA's chief executive officer.

53.  On February 9, 2001, the Individual Defendants caused the Company to issue a press release entitled "CIGNA Reports Fourth Quarter and Full Year 2000 Results." The press release provided in part:

CIGNA Corporation today reported fourth quarter 2000 operating income from continuing operations of $285 million, or $1.81 per share. This represents a 9% increase compared with operating income from continuing operations of $1.66 per share for the fourth quarter of 1999.

Excluding nonrecurring items in both 2000 and 1999, full year 2000 operating income from continuing operations was $1.1 billion ($6.84 per share). This represents a 27% increase compared with operating income from continuing operations of $5.38 per share for full year 1999.

"It is gratifying to see the marketplace recognize CIGNA for our product breadth and innovation in the employee benefits sector," said H. Edward Hanway, CIGNA's chief executive officer. "As an example, the addition of nearly one million medical lives in 2000 is a testament to our success in gaining market share by offering consumers the choices they value and need to effectively protect their families' health and well-being."

54.  On May 2, 2001, the Individual Defendants caused the Company to issue a press release entitled "CIGNA Reports First Quarter Results." The press release provided in part:

CIGNA Corporation today reported first quarter 2001 operating income of $272 million, or $1.76 per share, excluding an $8 million after-tax gain on the sale of a partial interest in a business. This represents a 12% increase over operating income of $1.57 per share for the first quarter of 2000.

"CIGNA's earnings growth reflects the breadth of our product and service capabilities and our commitment to increasing consumer choice and quality," said H. Edward Hanway, CIGNA's chief executive officer.

55.    On August 1, 2001, the Individual Defendants caused the Company to issue a press release entitled "CIGNA Reports Second Quarter Results."  The press release provided in part:

> CIGNA Corporation today reported second quarter 2001 operating income of $262 million, or $1.73 per share, excluding an after-tax gain of $22 million associated with the reinsurance business that was sold in 2000. Earnings per share were $1.71 for the second quarter of 2000, excluding an after-tax charge of $127 million associated with the run-off reinsurance business.
>
> For the first half of 2001, operating income was $534 million ($3.48 per share), compared with $544 million ($3.27 per share) in the first half of 2000, excluding the items noted above and an $8 million after-tax gain in the first quarter of 2001 on the sale of a partial interest in CIGNA's Japanese life insurance business.
>
> "CIGNA's earnings for the quarter reflect continued strong demand for our indemnity and specialty health care products as well as the challenges of escalating medical costs on our managed care operation," said H. Edward Hanway, CIGNA's chief executive officer.

56.    On November 2, 2001, the Individual Defendants caused the Company to issue a press release entitled "CIGNA Reports Third Quarter Results ."  The press release provided in part:

> CIGNA Corporation today reported third quarter 2001 operating income, excluding an after-tax gain of $33 million ($0.22 per share) associated with the reinsurance business sold in 2000, of $248 million, or $1.66 per share.  These results include charges of $25 million ($0.17 per share) after-tax related to the terrorist attacks of September 11, 2001.  The segment earnings described below exclude the effects of these charges and the reinsurance gain.  Excluding these charges and the gain noted above, earnings were $273 million or $1.83 per share.  Earnings per share were $1.76 for the third quarter of 2000.
>
> For the first nine months of 2001, operating income was $807 million ($5.31 per share).  This excludes $55 million in after-tax gains associated with the reinsurance business sold in 2000, the $25 million in after-tax charges relating to the events of September 11, and an $8 million after-tax gain for the sale of a partial interest in CIGNA's Japanese life insurance business.  This compares with operating income of $825 million ($5.03 per share) in the first nine months of 2000, which excludes after-tax charges of $127 million associated with the run-off reinsurance business.
>
> "Despite current economic challenges, our businesses have put in a solid performance and positioned us for growth," said H. Edward Hanway, CIGNA's Chairman and Chief Executive Officer.

57.    On February 8, 2002, the Individual Defendants caused the Company to issue a press release entitled "CIGNA Reports Fourth Quarter and Full Year 2001 Results."  The press release provided in part:

> CIGNA Corporation today reported fourth quarter 2001 operating income of $277 million ($1.92 per share), excluding non-recurring items. Operating income per share

was $1.81 for the fourth quarter of 2000. Excluding non-recurring items, full year 2001 operating income was $1.1 billion ($7.22 per share), representing a 6% increase in operating income per share compared with $6.84 per share for full year 2000. Operating income and the segment earnings described below exclude realized investment results and the effects of non-recurring items.

"In 2001, our employee benefits businesses made progress on key strategic initiatives while delivering improved overall financial results. The progress made in 2001 will contribute to our long-term growth," said H. Edward Hanway, CIGNA's Chairman and Chief Executive Officer.

58. On May 2, 2002, the Individual Defendants caused the Company to issue a press release entitled "CIGNA Reports First Quarter 2002 Results." The press release provided in part:

CIGNA Corporation today reported first quarter 2002 operating income of $275 million ($1.92 per share). Operating income for the first quarter 2001 was $272 million, or $1.76 per share, excluding an $8 million after-tax gain on the sale of a partial interest in a business. Operating income and segment earnings described below exclude realized investment results and the effects of nonrecurring items.

CIGNA ceased amortizing goodwill effective January 1, 2002, in accordance with newly adopted Statement of Financial Accounting Standards (SFAS) No.142, "Goodwill and Other Intangible Assets". On a comparable basis, operating income for the first quarter of 2001 was $284 million, or $1.84 per share, excluding the gain noted above.

59. On August 2, 2002, the Individual Defendants caused the Company to issue a press release entitled "CIGNA Reports Second Quarter 2002 Results." The press release provided in part:

CIGNA Corporation today reported second quarter 2002 operating income of $279 million ($1.95 per share), excluding a $2 million after-tax gain associated with the reinsurance business sold in 2000. Operating income for the second quarter 2001 was $262 million, or $1.73 per share, excluding a $22 million after-tax gain associated with the sold reinsurance business.

For the first half of 2002, operating income was $554 million ($3.87 per share), compared with $534 million ($3.48 per share) for the first half of 2001, excluding the items noted above and an $8 million after-tax gain on the sale of a partial interest in a business in the first quarter of 2001.

CIGNA ceased amortizing goodwill effective January 1, 2002, in accordance with newly adopted Statement of Financial Accounting Standards (SFAS) No. 142, "Goodwill and Other Intangible Assets." On a comparable basis, operating income for the second quarter of 2001 was $274 million ($1.81 per share) and for the first half of 2001 was $558 million ($3.64 per share), excluding the gains noted above.

"Our results were consistent with expectations, but below our potential. We are not satisfied with aggregate earnings levels and we are focused on actions to accelerate future earnings growth, while assuring that our customers receive the very best in employee benefits products and services," said H. Edward Hanway, CIGNA's Chairman and Chief Executive Officer.

- 20 -

60.     On November 1, 2002, the Individual Defendants caused the Company to issue a press release entitled "CIGNA Reports Third Quarter 2002 Results."  The press release provided in part:

> CIGNA Corporation today reported third quarter 2002 operating income of $208 million ($1.49 per share), excluding $1.045 billion after-tax in net nonrecurring charges.  Operating income for the third quarter 2001 was $273 million, or $1.83 per share, excluding an $8 million after-tax net nonrecurring gain.
>
> For the first nine months of 2002, operating income was $762 million ($5.41 per share), excluding $1.043 billion after-tax in net nonrecurring charges.  For the first nine months of 2001, operating income was $807 million ($5.31 per share), excluding a $38 million after-tax net nonrecurring gain.  Operating income and segment earnings described below exclude the effects of nonrecurring items.
>
> CIGNA ceased amortizing goodwill effective January 1, 2002, in accordance with Statement of Financial Accounting Standards (SFAS) No.142, "Goodwill and Other Intangible Assets."  On a comparable basis, operating income for the third quarter of 2001 was $285 million ($1.91 per share) and for the first nine months of 2001 was $843 million ($5.55 per share), excluding the nonrecurring items noted above.
>
> "Our results are below our expectations and our potential, reflecting shortfalls in our health care business.  Our other employee benefits businesses continue to achieve earnings in line with our expectations and to make progress in the execution of their strategies.  Aggressive actions are being taken to improve performance in our health care operations and we are confident that these actions will be successful," said H. Edward Hanway, CIGNA's Chairman and Chief Executive Officer.

61.     On February 7, 2003, the Individual Defendants caused the Company to issue a press release entitled "CIGNA Reports Fourth Quarter and Full Year 2002 Results."  The press release provided in part:

> CIGNA Corporation today reported consolidated net income, which includes income from continuing operations and income from discontinued operations, for the fourth quarter of 2002 of $47 million, or $0.33 per share, compared with $191 million, or $1.32 per share, for the same period last year.
>
> For full year 2002, consolidated net loss was $398 million, or $2.83 per share, compared with net income of $989 million, or $6.59 per share in 2001.
>
> Fourth quarter 2002 adjusted operating income from continuing operations was $178 million ($1.27 per share), excluding $143 million after- tax in net nonrecurring charges.  Adjusted operating income from continuing operations for the fourth quarter 2001 was $271 million, or $1.88 per share, excluding $21 million after-tax in net nonrecurring charges.
>
> For full year 2002, adjusted operating income from continuing operations was $935 million ($6.65 per share), excluding $1.177 billion after-tax in net nonrecurring charges.  Adjusted operating income from continuing operations for full year 2001

was $1.066 billion ($7.10 per share), excluding $17 million after-tax in net nonrecurring gains. Adjusted operating income and segment earnings described below exclude the effects of nonrecurring items.

CIGNA ceased amortizing goodwill effective January 1, 2002, in accordance with Statement of Financial Accounting Standards (SFAS) No.142, "Goodwill and Other Intangible Assets." On a comparable basis, adjusted operating income for the fourth quarter of 2001 was $283 million ($1.96 per share) and for the full year 2001 was $1.114 billion ($7.42 per share), excluding the nonrecurring items noted above.

"We are taking the necessary actions to improve the financial results of our health care business. Meanwhile, our other employee benefits businesses continue to produce solid financial results," said H. Edward Hanway, CIGNA's Chairman and Chief Executive Officer. "Taken together, our employee benefits businesses are providing real value to our customers.

"Our actions in the health care operations to realign the organization, improve service and streamline the cost structure are on track. Customers are already enjoying the benefit of improved service as evidenced by our key performance metrics. Efforts to streamline and simplify the organization and our cost structure are already reducing expense levels and will be completed later this year."

62.    On May 2, 2003, the Individual Defendants caused the Company to issue a press release entitled "CIGNA Reports First Quarter 2003 Results." The press release provided in part:

CIGNA Corporation today reported consolidated net income, which includes income from continuing operations and income from discontinued operations, for the first quarter of 2003 of $236 million, or $1.68 per share, compared with $218 million, or $1.52 per share, for the same period last year.

First quarter 2003 earnings from continuing operations before realized investment losses and special items were $205 million ($1.46 per share). First quarter 2002 earnings on the same basis were $275 million ($1.92 per share).

"Results for the quarter reflect solid execution on key initiatives in our health care operations and strong performance in our other employee benefits businesses," said H. Edward Hanway, CIGNA's Chairman and Chief Executive Officer.

63.    On August 1, 2003, the Individual Defendants caused the Company to issue a press release entitled "CIGNA Reports Second Quarter 2003 Results." The press release provided in part:

CIGNA Corporation today reported a net loss for the second quarter of 2003 of $53 million, or $0.38 per share, compared with net income of $214 million, or $1.50 per share, for the same period last year.

The loss for the quarter resulted from a $286 million after-tax charge in CIGNA's Run-off Reinsurance Operations segment. Relative to the prior year, results also reflect lower income in the Employee Health Care, Life, and Disability Benefits segment, partially offset by higher realized investment results.

Income from continuing operations before realized investment results and special items was $158 million or $1.13 per share for the second quarter of 2003 versus $280 million or $1.96 per share for the second quarter of 2002.

"The results from continuing operations reported today are consistent with our earnings preannouncement and reflect solid performance in our specialty health care, retirement, group disability and life and international operations. We continue to take aggressive action to improve results in our health care business. I am confident that the initiatives we are implementing to improve health care results will be successful," said H. Edward Hanway, CIGNA's chairman and chief executive officer, who also recently assumed direct responsibility for leading CIGNA's health care operations.

64.     On October 31, 2003, the Individual Defendants caused the Company to issue a press release entitled "CIGNA Reports Third Quarter 2003 Results." The press release provided in part:

CIGNA Corporation today reported net income for the third quarter of 2003 of $195 million, or $1.39 per share, compared with a net loss of $877 million, or $6.27 per share, for the same period last year.

The improvement in net income for the quarter primarily reflects reduced losses in CIGNA's run-off reinsurance operations.

Income from continuing operations before realized investment results and special items was $204 million or $1.45 per share for the third quarter of 2003 versus $202 million or $1.45 per share for the third quarter of 2002.

"Results for the quarter reflect solid sequential improvement in CIGNA's health care results and continued strong performance in our disability and life, retirement, and international businesses," said H. Edward Hanway, CIGNA's chairman and chief executive officer. "The business improvement and expense control initiatives implemented in CIGNA HealthCare are having a positive impact, as expected, and we are focused on continued strong execution of those initiatives."

65.     On February 6, 2004, the Individual Defendants caused the company to issue a press release entitled "CIGNA Outlines New Strategic Direction and Reports Fourth Quarter and Full Year 2003 Results." The press release provided in part:

CIGNA Corporation today reported net income for the fourth quarter of 2003 of $290 million, or $2.06 per share, compared with net income of $47 million, or $0.33 per share, for the same period last year.

For full year 2003, consolidated net income was $668 million, or $4.75 per share, compared with a net loss of $398 million, or $2.83 per share, in 2002.

Income from continuing operations before realized investment results and special items was $233 million, or $1.65 per share, for the fourth quarter of 2003 versus $178 million, or $1.27 per share, for the fourth quarter of 2002.

For the full year 2003, income from continuing operations before realized investment results and special items was $800 million, or $5.69 per share, versus $935 million, or $6.65 per share, for the full year 2002.

"Strong earnings for the quarter reflect higher results in our health care business - driven by improved fundamentals and progress we have made in implementing our health care performance improvement initiatives - as well as continued good performance in our disability and life, international, and retirement businesses," said H. Edward Hanway, CIGNA's chairman and chief executive officer. "We are keenly focused on further strengthening health care results and continuing to develop our other businesses, and we are optimistic about the prospects for continued improvement in results in 2004 and beyond."

66.    On April 30, 2004, the Individual Defendants caused the Company to issue a press release entitled "CIGNA Reports First Quarter 2004 Results - Higher Health Care Earnings Reflect Continued Improvement."  The press release provided in part:

CIGNA Corporation today reported net income for the first quarter of 2004 of $78 million, or $0.55 per share, compared with net income of $236 million, or $1.68 per share, for the same period last year.  The decline reflects the impact of an accounting change in the Retirement segment.

CIGNA's income from continuing operations before realized investment results and special items was $263 million, or $1.86 per share, for the first quarter of 2004 versus $205 million, or $1.46 per share, for the first quarter of 2003.  First quarter results in CIGNA's Health Care segment on this basis totaled $185 million, up 53% from the same period last year and 21% sequentially.

"Our earnings for the first quarter reflect significant improvement in our health care business, driven by solid execution of our medical management and expense reduction initiatives," said H. Edward Hanway, CIGNA's chairman and chief executive officer.  "We are driving further improvement by accelerating investment in our health care product portfolio and service capabilities. With the sale of our retirement benefits business completed, we have significant financial flexibility and have heightened our focus on our health care and related benefits businesses."

67.    On August 4, 2004, the Individual Defendants caused the Company to issue a press release entitled "CIGNA Reports Second Quarter 2004 Results and Increases Full Year Earnings Outlook."  The press release provided in part:

CIGNA Corporation today reported net income of $515 million, or $3.67 per share, for the second quarter of 2004 compared with a net loss of $53 million, or $0.38 per share, for the same period last year.  The increase primarily reflects gain recognition on the sale of CIGNA's retirement benefits business and higher Health Care segment earnings.  In addition, the year-over-year increase reflects a $286 million after-tax charge recorded in the second quarter of 2003 to strengthen certain reserves in the inactive run-off reinsurance business.

CIGNA's income from continuing operations before realized investment results and special items was $246 million, or $1.75 per share, for the second quarter

- 24 -

of 2004 versus $158 million, or $1.13 per share, for the second quarter of 2003.  The increase primarily reflects higher earnings in the Health Care, Disability and Life, and International segments.

"Our second quarter earnings reflect a strong performance by all of our employee benefits businesses," said H. Edward Hanway, CIGNA's chairman and chief executive officer.  "The continued earnings improvement in our health care business reflects effective medical management, disciplined underwriting, expense reduction initiatives, and strong service results. Our medical management model continues to drive improved utilization results while delivering superior quality outcomes.  Our continued strong execution of the fundamentals establishes a solid foundation for us to improve membership results."

68.    On November 3, 2004, the Individual Defendants caused the Company to issue a

press release entitled "CIGNA Reports Third Quarter 2004 Results."  The press release provided in

part:

CIGNA Corporation today reported net income of $320 million, or $2.34 per share, for the third quarter of 2004 compared with net income of $195 million, or $1.39 per share, for the same period last year.  The increase primarily reflects higher Health Care segment earnings and accelerated gain recognition on the sale of the retirement benefits business.

CIGNA's income from continuing operations before realized investment results and special items was $242 million, or $1.77 per share, for the third quarter of 2004 versus $204 million, or $1.45 per share, for the third quarter of 2003.  The increase primarily reflects higher earnings in the Health Care segment.

"Our Health Care segment earnings reflect the progress we continue to make in medical management, service, and underwriting.  We are successfully lowering our customers' medical cost trends, while maintaining the industry's highest quality results," said H. Edward Hanway, CIGNA's chairman and chief executive officer.  "Solid execution of these fundamentals, which we have consistently demonstrated over the last several quarters, is building a strong foundation to improve membership results."

### REASONS THE STATEMENTS WERE IMPROPER

69.    The true facts, which were known by each of the Individual Defendants but concealed

from the public during the Relevant Period, were as follows:

(a)    That illegal and concealed "contingent commissions" pursuant to illegal

"contingent commission agreements" were being paid;

(b)    That by concealing these "contingent commissions" and such " contingent

commission agreements," the Individual Defendants violated applicable principles of fiduciary law,

- 25 -

subjecting the Company to enormous fines and penalties totaling potentially tens - if not hundreds - of millions of dollars; and

(c)     That as a result of (a)-(b) above, the Company's prior reported revenue and income was grossly overstated.

## IMPROPER FINANCIAL REPORTING
## DURING THE RELEVANT PERIOD

70.     In order to overstate its earnings during the Relevant Period, the Individual Defendants caused CIGNA to violate Generally Accepted Accounting Principles ("GAAP") and SEC rules by causing CIGNA to fail to properly report and disclose the illegal nature of its revenue during the Relevant Period.

71.     These financial statements and the statements about them were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the improper accounting for and disclosure about CIGNA' revenues, in violation of GAAP and SEC rules.  The Individual Defendants manipulated financial statements by allowing the Company to generate fees which it was not entitled to, which revenues may be forfeited (via fines, judgments and costs associated therewith) and which artificially inflated CIGNA's revenue and income.

72.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Regulation S-X (17 C.F.R.  §210.4-01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R.  §210.10-01(a).

73.     Due to these accounting improprieties caused by the Individual Defendants, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

- 26 -

(a)      The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, 10);

(b)      The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, 34);

(c)      The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, 40);

(d)      The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, 50);

(e)      The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, 42);

(f)      The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, 58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, 79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, 95, 97).

74.     Further, the undisclosed adverse information concealed by the Individual Defendants during the Relevant Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

75.     As a result of the Individual Defendants' actions, CIGNA's market capitalization has been damaged.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

76.     Plaintiff brings this action derivatively in the right and for the benefit of CIGNA to redress injuries suffered, and to be suffered, by CIGNA as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  CIGNA is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

77.     Plaintiff will adequately and fairly represent the interests of CIGNA in enforcing and prosecuting its rights.

78.     Plaintiff is and was an owner of the stock of CIGNA during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

79.     The current Board of CIGNA consists of the following ten individuals: defendants Hanway, Shoemate, Sullivan, Larson, Neubauer, Wagner, Wait, Ware and Henney and Robert H. Campbell ("Campbell"), Donna Zarcone, and William D. Zollars.  Plaintiff has not made any demand on the present Board of CIGNA to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

(a)     The Corporate Governance Committee of the Board reviews, advises and reports to the Board on the compensation of directors, including assisting in the administration of director compensation plans.  The Corporate Governance Committee is comprised of defendants Henney, Shoemate, Sullivan, Wagner and Ware.  As the members of the Corporate Governance Committee singularly control the other defendants' awards, the remaining members of the Board will not institute this action against defendants Henney, Shoemate, Sullivan, Wagner and Ware.  To do so would jeopardize each defendant's personal financial compensation.  Thus, demand on defendants Hanway, Larson, Neubauer and Wait and Campbell is futile;

(b)     The principal professional occupation of defendant Hanway is his employment with CIGNA, pursuant to which he received and continues to receive substantial monetary compensations and other benefits.  Specifically, for FY:99, FY:00, FY:01, FY:02 and FY:03, CIGNA paid defendant Hanway $6,256,800, $9,233,700, $10,482,900, $9,802,000 and $8,839,600, respectively, in salary, bonus restricted stock awards, LTIP payouts and other compensation, and granted him 228,612, 284,526, 262,026, 328,526 and 250,000 options to purchase CIGNA stock, respectively.  Accordingly, defendant Hanway lacks independence from defendants Wagner, Sullivan and Ware and Campbell, individuals who are not disinterested and/or independent and who exert influence over defendant Hanway's compensation by virtue of their positions as members of the Peoples Resources Committee which is responsible for annually establishing corporate goals and objectives relevant to the CEO's compensation; evaluating the CEO's performance in light of those established goals and objectives and use of this evaluation to determine and approve the CEO's compensation.  This lack of independence renders defendant Hanway incapable of impartially considering a demand to commence and vigorously prosecute this action;

(c)     According to CIGNA's Proxy Statement filed with the SEC on or about March 26, 2004, defendants Henney, Shoemate, Sullivan, Larson, Neubauer, Wagner, Wait and Ware and Campbell, receive $50,000 annually for Board membership.  At least $25,000 of this annual Board retainer is paid in CIGNA common stock equivalents.  Each director also receives $10,000 annually for each committee membership.  Committee chairs and members of the Executive Committee do not receive this retainer.  Each committee chair other than the chair of the Executive Committee receives $15,000 annually.  Each director is entitled to an annual credit of $61,000 to a Restricted Deferred Compensation Account under the Deferred Compensation Plan for directors of CIGNA Corporation.  This amount is credited in restricted common stock equivalents and is payable in cash when a director dies or retires from the Board.  Defendants Henney, Shoemate, Sullivan, Larson, Neubauer, Wagner, Wait and Ware and Campbell also receive a one-time grant of 4,500 shares of common stock under the Restricted Stock Plan for Non-Employee Directors of CIGNA Corporation ("Restricted Stock Plan.")  The restricted shares are non transferable for six months after the date of the grant. Under the Restricted Stock Plan, shares are forfeited if a director's service ends for any reason other than death or retirement.  Defendant Henney received 4,500 restricted shares under the Restricted Stock Plan worth $284,175 on October 28, 2004.  These restricted shares will not vest until April 28, 2005.  Accordingly, defendants Henney, Shoemate, Sullivan, Larson, Neubauer, Wagner, Wait and Ware and Campbell are incapable of impartially considering a demand to commence and vigorously prosecute this action because they have an interest in safeguarding their substantial compensation;

(d)     According to CIGNA's Proxy Statement filed with the SEC on or about March 26, 2004, defendants Henney, Shoemate, Larson, Neubauer and Wait were, during the Relevant Period, members of the Audit Committee.  The Audit Committee is responsible for assisting the Board in fulfilling its oversight responsibilities regarding: the adequacy of the Company's internal controls and the integrity of the Company's financial information reported to the public, the performance of the Company's internal audit function, the appropriateness of the Company's accounting policies and the Company's compliance with legal and regulatory requirements.

Nonetheless, the Audit Committee recommended that the Board include the improper audited consolidated financial statements in CIGNA's Annual Report on Form 10-K for the year ended December 31, 2003, as filed with the SEC. By such actions, defendants Henney, Shoemate, Larson, Neubauer and Wait breached their duties by causing or allowing the improper financials described above. As a result of these defendants' breach of their duties, any demand upon them is futile;

        (e)     The entire CIGNA Board and senior management participated in the wrongs complained of herein. CIGNA's directors are not disinterested or independent due to the following: defendants Hanway, Shoemate, Sullivan, Larson, Neubauer, Wagner, Wait, Ware and Henney served on the CIGNA Board during the Relevant Period. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the above-referenced defendants breached the fiduciary duties that they owed to CIGNA and its shareholders in that they failed to prevent and correct the improper financials. Thus, the CIGNA Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected CIGNA to millions of dollars in liability for possible violations of applicable securities laws;

        (f)     Each of the key officers and directors knew of and/or directly benefitted from the wrongdoing complained of herein;

        (g)     The Director Defendants of CIGNA, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from CIGNA's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

        (h)     In order to bring this suit, all of the directors of CIGNA would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

        (i)     The acts complained of constitute violations of the fiduciary duties owed by CIGNA's officers and directors and these acts are incapable of ratification;

- 31 -

(j)     Each of the Director Defendants of CIGNA authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

(k)     Any suit by the current directors of CIGNA to remedy these wrongs would likely expose the Individual Defendants and CIGNA to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

(l)     CIGNA has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for CIGNA any part of the damages CIGNA suffered and will suffer thereby;

(m)     If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants.  In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions.  This they will not do.  Thus, demand is futile; and

(n)     If CIGNA's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of CIGNA.  However, due to certain changes in the language of directors' and officers'

liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by CIGNA against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of CIGNA, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause CIGNA to sue them, since they will face a large uninsured liability.

80. Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for CIGNA for any of the wrongdoing alleged by plaintiff herein.

81. Plaintiff has not made any demand on shareholders of CIGNA to institute this action since such demand would be a futile and useless act for the following reasons:

(a) CIGNA is a publicly held company with over 134 million shares outstanding, and thousands of shareholders;

(b) Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c) Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT ONE

### Against All Defendants for Breach of Fiduciary Duty

82. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

83. The Individual Defendants owed and owe CIGNA fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe CIGNA the highest obligation of good faith, fair dealing, loyalty and due care.

- 33 -

84.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

85.     Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

86.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, CIGNA has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

87.     Plaintiff on behalf of CIGNA has no adequate remedy at law.

## COUNT TWO

### Against All Defendants for Abuse of Control

88.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

89.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence CIGNA, for which they are legally responsible.

90.     As a direct and proximate result of the Individual Defendants' abuse of control, CIGNA has sustained significant damages.

91.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

92.     Plaintiff on behalf of CIGNA has no adequate remedy at law.

## COUNT THREE

### Against All Defendants for Gross Mismanagement

93.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

- 34 -

94.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of CIGNA in a manner consistent with the operations of a publicly held corporation.

95.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, CIGNA has sustained significant damages in excess of hundreds of millions of dollars.

96.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

97.     Plaintiff on behalf of CIGNA has no adequate remedy at law.

## COUNT FOUR

### Against All Defendants for Waste of Corporate Assets

98.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

99.     As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused CIGNA to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions/billions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

100.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

101.    Plaintiff on behalf of CIGNA has no adequate remedy at law.

## COUNT FIVE

### Against All Defendants for Unjust Enrichment

102.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

- 35 -

103.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of CIGNA.

104.    Plaintiff, as a shareholder and representative of CIGNA, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of CIGNA has an effective remedy;

C.      Awarding to CIGNA restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

D.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: February 24, 2005                    THE WEISER LAW FIRM, P.C.

_____
Patricia C. Weiser (PA #78295)
Robert B. Weiser (PA #81575)
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Telephone: (610) 225-2677
Facsimile: (610) 225-2678

ROBBINS UMEDA & FINK, LLP
Brian J. Robbins
Jeffrey P. Fink
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990
Facsimile: 619/525-3991

Attorneys for Plaintiff

- 37 -